# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | MDL 2804 |
| | ) | Case No. 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | ) ) | |
| *West Ascension Parish Hospital Service District d/b/a Prevost Memorial Hospital v.* | ) ) ) ) | Judge Dan Aaron Polster |
| *Amerisourcebergen Drug Corp.  et al.* | ) ) | SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND |
| 1:20-op-45207 | ) ) | JURY DEMAND |

Plaintiff, WEST ASCENSION PARISH HOSPITAL SERVICE DISTRICT D/B/A PREVOST MEMORIAL HOSPITAL, submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al., Case No. 1:18-op-45090 ("Summit County Pleadings"), In Re National Prescription Opiate Litigation, in the United States District Court for the Northern District of Ohio, Doc. ##: 513, 514,1[1] and as may be amended in the future, and any additional claims asserted herein.

---

[1] Docket #: 513 is the redacted Summit Second Amended Complaint and Docket #: 514 is the unredacted Summit Corrected Second Amended Complaint filed under seal in Case No. 1:17-md-02804-DAP. The redacted

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

1.  Plaintiff(s)' Existing Complaint (No. 20-op-42507 Doc #: 1-3) is expressly incorporated by reference to this Short Form as if fully set forth herein.

## COMMON FACTUAL ALLEGATIONS

2.  By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the Summit County Pleadings as identified in the Court's Order implementing the Short Form procedure. Doc. #: __1282__.

☑ Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)

☑ RICO Marketing Enterprise Common Factual Allegations (Paragraphs 814-848)

☑ RICO Supply Chain Enterprise Common Factual Allegations (Paragraphs 849-877)

3.  If additional claims are alleged below that were not pled in Plaintiff's Existing complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here. Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):

See attached Addendum _____

## CLAIMS

4.  The following federal **RICO causes of action** asserted in the *Summit County* Pleadings as identified in the Court's implementing order and any subsequent amendments,

---

Summit Corrected Second Amended Complaint is also filed in its individual docket, Case No. 1:18-op-45090-DAP, Docket #: 24.

Doc. #: 1282 , are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):

☑ First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Summit County* Pleadings, Paragraphs 878-905)

☑ Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Summit County* Pleadings, Paragraphs 906-938)

     5.    Plaintiff adopts the following additional claims as indicated below (below or attached):

See attached addendum_____

     WHEREFORE, Plaintiff(s) prays for relief as set forth in the *Summit County* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

**Dated**: October 21, 2020 _____ **Signed:** __/s/ Walter J. Leger, Jr._____

                       *Attorney for Plaintiff*

                       Walter J. Leger, Jr., La. Bar No. 8278
                       Franklin G. Shaw, La. Bar No. 1794
                       Matthew S. Landry, La. Bar No. 36543
                       **LEGER & SHAW**
                       935 Gravier Street, Suite 2150
                       New Orleans, LA 70112
                       Telephone: (504) 588-9043
                       Facsimile: (504) 588-9980
                       wleger@legershaw.com
                       mlandry@legershaw.com

Charles S. Long, La. Bar No.1189
Spencer Long, La. Bar No. 38041
**LONG & LONG**
316 Chetimatches St.
Donaldsonville, LA 70346
Telephone:  (225) 473-9215
Facsimile:  (225) 473-6424
chuckslong@aol.com

*Counsel for Plaintiff,*
**WEST ASCENSION PARISH**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Short Form for Supplementing Complaint

and Amending Defendants was served on October 21, 2020 by electronic filing through the court's

electronic filing system upon all counsel of record of all previously named defendants.

   /s/ Walter J. Leger, Jr.
Walter J. Leger, Jr., La. Bar No. 8278
Franklin G. Shaw, La. Bar No. 1794
Matthew S. Landry, La. Bar No. 36543
**LEGER & SHAW**
935 Gravier Street, Suite 2150
New Orleans, LA 70112
Telephone: (504) 588-9043
Facsimile: (504) 588-9980
wleger@legershaw.com
mlandry@legershaw.com

*West Ascension Parish Hospital Service District d/b/a Prevost Memorial Hospital*

**ADDENDUM TO SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS: ADDITIONAL FACTS SUPPORTING RACKETEERING CLAIMS AND ADDITIONAL RACKETEERING CLAIMS**

---

**ADDITIONAL FACTS SUPPORTING RACKETEERING CLAIMS**

---

**II.      FACTS PERTAINING TO CLAIMS UNDER LOUISIANA RACKETEERING ACT, LA. REV. STAT. ANN. § 15:1351, ET SEQ.**

     **A.      The Opioid Marketing Enterprise**

          **1.      The Common Purpose and Scheme of the Opioid Marketing Enterprise**

     **1.**      Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, the Racketeering Marketing Defendants[2] formed an enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

     **2.**      In order to unlawfully increase the demand for opioids, the Racketeering Marketing Defendants formed an enterprise (the "Opioid Marketing Enterprise") with the "Front Groups" and KOLs described above. Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the

---

[2] The Racketeering Marketing Defendants referred to in this section include ~~Purdue~~, Cephalon, Janssen, Endo, and Mallinckrodt. Acknowledging that Bankruptcy Proceedings have been commenced regarding certain Defendants originally named in the original petition for damages, especially Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and INSYS Therapeutics, Inc., this amending complaint is intended in no way to commence or continue any action or proceeding against those parties, subject to a stay.

Opioid Marketing Enterprise's common purpose. The Racketeering Marketing Defendants' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

3. The Racketeering Marketing Defendants, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Racketeering Marketing Defendants named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing present no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

4. The scheme devised, implemented and conducted by the Racketeering Marketing Defendants was a common course of conduct designed to ensure that the Racketeering Marketing Defendants unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Racketeering Marketing Defendants' drugs. The Racketeering Marketing Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

5.      There was regular communication between the Racketeering Marketing Defendants, Front Groups and KOLs, in which information was shared, misrepresentations were coordinated, and payments were exchanged. Typically, the coordination, communication and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the Racketeering Marketing Defendants, Front Groups, and KOLs share information regarding overcoming objections and resistance to the use of opioids for chronic pain. The Racketeering Marketing Defendants, Front Groups and KOLs functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

6.      At all relevant times, the Front Groups were aware of the Racketeering Marketing Defendants' conduct, were knowing and willing participants in and beneficiaries of that conduct. Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and the Plaintiffs. But for the Opioid Marketing Enterprise's unlawful fraud, the Front Groups would have had incentive to disclose the deceit by the Racketeering Marketing Defendants and the Opioid Marketing Enterprise to their members and constituents. By failing to disclose this information, Front Groups perpetuated the Opioid Marketing Enterprise's scheme and common purpose, and reaped substantial benefits.

7.      At all relevant times, the KOLs were aware of the Racketeering Marketing Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct. The Racketeering Marketing Defendants selected KOLs solely because they favored the aggressive treatment of chronic pain with opioids. The Racketeering Marketing Defendants' support helped the KOLs become respected industry experts. And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying

the Racketeering Marketing Defendants by advancing their marketing goals. The KOLs also knew, but did not disclose, that the other KOLS and Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and the Plaintiffs. But for the Opioid Marketing Enterprise's unlawful conduct, the KOLs would have had incentive to disclose the deceit by the Racketeering Marketing Defendants and the Opioid Marketing Enterprise, and to protect their patients and the patients of other physicians. By failing to disclose this information, KOLs furthered the Opioid Marketing Enterprise's scheme and common purpose, and reaped substantial benefits.

8.      As public scrutiny and media coverage focused on how opioids ravaged communities in Louisiana, including in  Ascension Parish  and throughout the United States, the Front Groups and KOLS did not challenge the Racketeering Marketing Defendants' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

9.      The Racketeering Marketing Defendants, Front Groups and KOLs engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. As described herein, the Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved: (1) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (2) lobbying to defeat measures to restrict over-prescription; (3) efforts to criticize or undermine CDC guidelines; and (4) efforts to limit prescriber accountability.

10.      In addition to disseminating misrepresentations about the risks and benefits of opioids, the Opioid Marketing Enterprise also furthered its common purpose by criticizing or

4

undermining CDC Guideline. Members of the Opioid Marketing Enterprise criticized or undermined the CDC Guideline, which represented "an important step—and perhaps the first major step from the federal government—toward limiting opioid prescriptions for chronic pain."

11.     Several Front Groups, including the U.S. Pain Foundation and the AAPM, criticized the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."

12.     The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."

13.     The Racketeering Marketing Defendants alone could not have accomplished the purpose of the Opioid Marketing Enterprise without the assistance of the Front Groups and KOLs, who were perceived as "neutral" and more "scientific" than the Racketeering Marketing Defendants themselves. Without the work of the Front Groups and KOLs in spreading misrepresentations about opioids, the Opioid Marketing Enterprise could not have achieved its common purpose.

14.     The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, the opioids continue to be prescribed and used for chronic pain throughout the area of Ascension Parish and the epidemic continues to injure Plaintiff and consume the resources of Plaintiffs' health care and law enforcement systems.

15.     As a result, it is clear that the Racketeering Marketing Defendants, the Front Groups, and the KOLs were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**2.**    **The Conduct of the Opioid Marketing Enterprise violated the Louisiana Racketeering Act, La. Rev. Stat. Ann. § 15:1351, ET SEQ.**

**16.**      From approximately the late 1990s to the present, each of the Racketeering Marketing Defendants exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

   a. Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

   b. Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

   c. Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

   d. Creating and providing a body of deceptive, misleading and unsupported CMEs and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

   e. Selecting, cultivating, promoting and paying KOLs based solely on their willingness to communicate and distribute the Racketeering Marketing Defendants' messages about the use of opioids for chronic pain;

   f. Providing substantial opportunities for KOLs to participate in research studies on topics the Racketeering Marketing Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

   g. Paying KOLs to serve as consultants or on the Racketeering Marketing Defendants' advisory boards, on the advisory boards and in leadership

6

positions on Front Groups, and to give talks or present CMEs, typically over meals or at conferences;

h.  Selecting, cultivating, promoting, creating and paying Front Groups based solely on their willingness to communicate and distribute the Racketeering Marketing Defendants' messages about the use of opioids for chronic pain;

i.  Providing substantial opportunities for Front Groups to participate in and/or publish research studies on topics the Racketeering Marketing Defendants suggested or chose (and paid for), with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

j.  Paying significant amounts of money to the leaders and individuals associated with Front Groups;

k.  Donating to Front Groups to support talks or CMEs, that were typically presented over meals or at conferences;

l.  Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

m. Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

n.  Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters, and the help of the Front Groups as publishers, and supporters;

o.  Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Racketeering Marketing Defendants, such as veterans and the elderly, and then funding that distribution;

p.  Concealing their relationship to and control of Front Groups and KOLs from the Plaintiffs and the public at large; and

q.  Intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities, promotional and other materials that claimed opioids could be safely used for chronic pain.

17.  The Opioid Marketing Enterprise had a hierarchical decision-making structure that was headed by the Racketeering Marketing Defendants and corroborated by the KOLs and Front Groups. The Racketeering Marketing Defendants controlled representations made about their opioids and their drugs, doled out funds to PBMs and payments to KOLs, and ensured that

representations made by KOLs, Front Groups, and the Racketeering Marketing Defendants' sales detailers were consistent with the Marketing Defendants' messaging throughout the United States and Louisiana, including in   Ascension Parish. The Front Groups and KOLS in the Opioid Marketing Enterprise were dependent on the Racketeering Marketing Defendants for their financial structure and for career development and promotion opportunities.

18.     The Front Groups also conducted and participated in the conduct of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.  The Front Groups promised to, and did, make representations regarding opioids and the Racketeering Marketing Defendants' drugs that were consistent with the Racketeering Marketing Defendants' messages;

b.  The Front Groups distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain outweighed the risks;

c.  The Front Groups echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of the Racketeering Marketing Defendants;

d.  The Front Groups issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

e.  The Front Groups strongly criticized the 2016 guidelines from the Center for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain; and

f.  The Front Groups concealed their connections to the KOLs and the Racketeering Marketing Defendants.

19.     The Racketeering Marketing Defendants' Front Groups, "with their large numbers and credibility with policymakers and the public—have 'extensive influence in specific disease areas.'" The larger Front Groups "likely have a substantial effect on policies relevant to their industry sponsors."[3] "By aligning medical culture with industry goals in this way, many of the

---

[3] *Fueling an Epidemic*, *supra* note 85, at 1.

8

groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioid epidemic."[4]

20.     The KOLs also participated in the conduct of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

      a. The KOLs promised to, and did, make representations regarding opioids and the Racketeering Marketing Defendants' drugs that were consistent with the Racketeering Marketing Defendants' messages themselves;

      b. The KOLs distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain outweighed the risks;

      c. The KOLs echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of the Racketeering Marketing Defendants;

      d. The KOLs issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

      e. The KOLs strongly criticized the 2016 guidelines from the Center for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain; and

      f. The KOLs concealed their connections to the Front Groups and the Racketeering Marketing Defendants, and their sponsorship by the Racketeering Marketing Defendants.

21.     The scheme devised and implemented by the Racketeering Marketing Defendants and members of the Opioid Marketing Enterprise, amounted to a common course of conduct intended to increase the Racketeering Marketing Defendants' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

---

[4] *Id*. at 2.

### 3. The Racketeering Marketing Defendants Controlled and Paid Front Groups and KOLs to Promote and Maximize Opioid Use

22. As discussed in detail above, the Racketeering Marketing Defendants funded and controlled the various Front Groups, including APF, AAPM/APS, FSMB, Alliance for Patient Access, USPF, and AGS. The Front Groups, which appeared to be independent, but were not, transmitted the Racketeering Marketing Defendants' misrepresentations. The Racketeering Marketing Defendants and the Front Groups thus worked together to promote the goals of the Opioid Marketing Enterprise.

23. The Racketeering Marketing Defendants worked together with each other through the Front Groups that they jointly funded and through which they collaborated on the joint promotional materials described above.

24. Similarly, as discussed in detail above, the Racketeering Marketing Defendants paid KOLs, including Drs. Portenoy, Fine, Fishman, and Webster, to spread their misrepresentations and promote their products. The Racketeering Marketing Defendants and the KOLs thus worked together to promote the goals of the Opioid Marketing Enterprise.

### 4. Pattern of Racketeering Activity

25. The Racketeering Marketing Defendants' scheme described herein was perpetrated, in part, through multiple acts constituting a pattern of racketeering activity as described herein.

26. The pattern of racketeering activity used by the Racketeering Marketing Defendants and the Opioid Marketing Enterprise likely involved thousands of separate instances in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-

addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Racketeering Marketing Defendants' drugs induced by consumers, prescribers, regulators and Plaintiffs' reliance on the Racketeering Marketing Defendants' misrepresentations.

27.     Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Racketeering Marketing Defendants, the Front Groups and the KOLs defrauded and intended to defraud Louisiana consumers, including in  Ascension Parish, the State,  Ascension Parish and other intended victims.

28.     The Racketeering Marketing Defendants devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain. The Racketeering Marketing Defendants and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs and were not supported by actual evidence. The Racketeering Marketing Defendants intended that that their common purpose and scheme to defraud intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

29.     By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators and the public, including Plaintiffs, the Racketeering Marketing Defendants, the Front Groups and the KOLs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

30.     The Racketeering Marketing Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

    a.  Marketing materials about opioids, and their risks and benefits, which the Racketeering Marketing Defendants sent to health care providers, transmitted through the internet and television, published, and transmitted to Front Groups and KOLs located across the country and Louisiana, including Ascension Parish;

    b.  Written representations and telephone calls between the Racketeering Marketing Defendants and Front Groups regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

    c.  Written representations and telephone calls between the Racketeering Marketing Defendants and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

    d.  E-mails, telephone and written communications between the Racketeering Marketing Defendants and the Front Groups agreeing to or implementing the opioids marketing scheme;

    e.  E-mails, telephone and written communications between the Racketeering Marketing Defendants and the KOLs agreeing to or implementing the opioids marketing scheme;

    f.  Communications between the Racketeering Marketing Defendants, Front Groups and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

    g.  Communications between the Racketeering Marketing Defendants, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

    h.  Written and oral communications directed to State agencies, federal and state courts, and private insurers throughout Louisiana, including Ascension Parish that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

    i.  Receipts of increased profits—the wrongful proceeds of the scheme.

31.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Racketeering Marketing Defendants that the Front Groups and the KOLs would distribute publications, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

32.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Racketeering Marketing Defendants and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and the Plaintiff: (a) the fraudulent nature of the Racketeering Marketing Defendants' marketing scheme; (b) the fraudulent nature of statements made by the Racketeering Marketing Defendants and by their KOLs, Front Groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

33.    The Racketeering Marketing Defendants, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Racketeering Marketing Defendants' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

34.    Indeed, for the Racketeering Marketing Defendants' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that the Racketeering Marketing Defendants each financed, supported, and worked through the same KOLs and Front Groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

35.    The Racketeering Marketing Defendants' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while

simultaneously generating billion-dollar revenue and profits for the Racketeering Marketing Defendants. The predicate acts were committed or caused to be committed by the Racketeering Marketing Defendants through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

### B.    The Opioid Supply Chain Enterprise

36.    Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort to "a categorical denial of any criminal behavior or intent."[5] Defendants' actions went far beyond what could be considered ordinary business conduct. For more than a decade, certain Defendants, the "Racketeering Supply Chain Defendants"[6] worked together in an illicit enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

37.    Knowing that dangerous drugs have a limited place in our society, and that their dissemination and use must be vigilantly monitored and policed to prevent the harm that drug abuse and addiction causes to individuals, society and governments, Congress enacted the Controlled Substances Act and Louisiana adopted the Uniform Controlled Dangerous Substances Law ("CSA"). Specifically, through the CSA, which created a closed system of distribution for controlled substances, Louisiana established an enterprise for good. CSA imposes a reporting duty

---

[5] McKesson Responds to Recent 60 Minutes Story About January 2017 Settlement With the Federal Government, McKesson, http://www.mckesson.com/about-mckesson/fighting-opioid-abuse/60-minutes-response (last visited Apr. 21, 2018).

[6] The Racketeering Supply Chain Defendants referred to in this section include ~~Purdue~~, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen. Acknowledging that Bankruptcy Proceedings have been commenced regarding certain Defendants originally named in the original petition for damages, especially Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and INSYS Therapeutics, Inc., this amending complaint is intended in no way to commence or continue any action or proceeding against those parties, subject to a stay.

that cuts across company lines. Regulations adopted under the CSA require that companies who are entrusted with permission to operate within this system cannot simply operate as competitive in an "anything goes" profit-maximizing market. Instead, the statute tasks them to watch over each other with a careful eye for suspicious activity. Driven by greed, Defendants betrayed that trust and subverted the constraints of the CSA's closed system to conduct their own enterprise for evil.

38.     As "registrants", the Racketeering Supply Chain Defendants are duty bound to identify and report orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. Critically, these Defendants' responsibilities do not end with the products they manufacture or distribute—there is no such limitation in the law because their duties cut across company lines. Thus, when these Defendants obtain information about the sales and distribution of other companies' opioid products, as they did through data mining companies like IMS Health, they were legally obligated to report that activity to the authorities.

39.     If morality and the law did not suffice, competition dictates that the Racketeering Supply Chain Defendants would turn in their rivals when they had reason to suspect suspicious activity. Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so. This whistleblower or watchdog function is not only a protected choice, but a statutory mandate. Unfortunately, however, that is not what happened. Instead, knowing that investigations into potential diversion would only lead to shrinking markets, the Racketeering Supply Chain Defendants elected to operate in a conspiracy of silence, in violation of both the CSA and the Louisiana Racketeering Act.

40.     The Racketeering Supply Chain Defendants' scheme required the participation of all. If any one member broke rank, its compliance activities would highlight deficiencies of the

15

others, and the artificially high quotas they maintained through their scheme would crumble. But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the authorities to go after any one of them. Accordingly, through the connections they made as a result of their participation in the Healthcare Distribution Alliance ("HDA"), the Racketeering Supply Chain Defendants chose to flout the closed system designed to protect the citizens. Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances." But, privately, the Racketeering Supply Chain Defendants refused to act and through their lobbying efforts, they collectively sought to undermine the impact of the CSA. Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize these Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied. John Gray, President and CEO of the HDA said in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Yet, the Racketeering Supply Chain Defendants apparently all found the same profit-maximizing balance -- intentionally remaining silent to ensure the largest possible financial return.

41.     As described above, at all relevant times, the Racketeering Supply Chain Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by authorities that would allow them to collectively benefit from a greater pool of prescription opioids to manufacture and distribute. In support of this common purpose and fraudulent scheme, the Racketeering Supply Chain Defendants jointly agreed to disregard their statutory duties to identify, investigate, halt and

report suspicious orders of opioids and diversion of their drugs into the illicit market so that those orders would not result in a decrease, or prevent an increase in, the necessary quotas.

42.     At all relevant times, as described above, the Racketeering Supply Chain Defendants exerted control over, conducted and/or participated in the Opioid Supply Chain Enterprise by fraudulently claiming that they were complying with their duties under the CSA to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, and to halt such unlawful sales, so as to increase production quotas and generate unlawful profits, as follows:

43.     The Racketeering Supply Chain Defendants disseminated false and misleading statements to state and federal regulators claiming that:

     a.  the quotas for prescription opioids should be increased;

     b.  they were complying with their obligations to maintain effective controls against diversion of their prescription opioids;

     c.  they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

     d.  they were complying with their obligation to notify the authorities of any suspicious orders or diversion of their prescription opioids; and

     e.  they did not have the capability to identify suspicious orders of controlled substances.

44.     The Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied to strip the authorities of their ability to immediately suspend registrations pending investigation by passing the laws like the "Ensuring Patient Access and Effective Drug Enforcement Act."[7]

---

[7] *HDMA is Now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/ (last updated July 6, 2016); Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-

45.     The law requires the Racketeering Supply Chain Defendants to make reports to the authorities of any suspicious orders identified through the design and operation of their system to disclose suspicious orders. The failure to make reports as required by the law amounts to a criminal violation of the statute.

46.     The Racketeering Supply Chain Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the authorities about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the authorities including the Marketing Defendants' applications for production quotas. Specifically, the Racketeering Supply Chain Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the authorities in their mandatory reports and their applications for production quotas.

47.     The Racketeering Supply Chain Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

48.     In devising and executing the illegal scheme, the Racketeering Supply Chain Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by

---

d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

49.     For the purpose of executing the illegal scheme, the Racketeering Supply Chain Defendants committed racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme. These racketeering acts constituted a pattern of racketeering.

50.     The Racketeering Supply Chain Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Marketing Defendants, the Distributor Defendants, or third parties that were foreseeably caused to be sent as a result of the Racketeering Supply Chain Defendants' illegal scheme, including but not limited to:

    a.  The prescription opioids themselves;

    b.  Documents and communications that supported and/or facilitated the Racketeering Supply Chain Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

    c.  Documents and communications that facilitated the manufacture, purchase and sale of prescription opioids;

    d.  Racketeering Supply Chain Defendants' government registrations;

    e.  Documents and communications that supported and/or facilitated Racketeering Supply Chain Defendants' government registrations;

    f.  Racketeering Supply Chain Defendants' records and reports that were required to be submitted to the authorities;

    g.  Documents and communications related to the Racketeering Supply Chain Defendants' mandatory reports;

    h.  Documents intended to facilitate the manufacture and distribution of the Racketeering Supply Chain Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

    i.  Documents for processing and receiving payment for prescription opioids;

    j.  Payments from the Distributors to the Marketing Defendants;

    k.   Rebates and chargebacks from the Marketing Defendants to the Distributors Defendants;

    l.   Payments to the Racketeering Supply Chain Defendants' lobbyists through the PCF;

    m.   Payments to the Racketeering Supply Chain Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

    n.   Deposits of proceeds from the Racketeering Supply Chain Defendants' manufacture and distribution of prescription opioids; and

    o.   Other documents and things, including electronic communications.

51.     The Racketeering Supply Chain Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier, including the following:

| Defendant Group Name | Company Names | Drugs | | |
|---|---|---|---|---|
| | | Drug Name | Chemical Name | CSA Schedule |
| Purdue[8] | (1)Purdue Pharma, LP, (2)Purdue Pharma, Inc., (3)The Purdue Frederick Company | OxyContin | Oxycodone hydrochloride extended release | Schedule II |
| | | MS Contin | Morphine sulfate extended release | Schedule II |
| | | Dilaudid | Hydromorphone hydrochloride | Schedule II |
| | | Dilaudid-HP | Hydromorphone hydrochloride | Schedule II |
| | | Butrans | Buprenorphine | Schedule II |
| | | Hysinga ER | Hydrocodone bitrate | Schedule II |

---

[8] Acknowledging that Bankruptcy Proceedings have been commenced regarding certain Defendants originally named in the original petition for damages, especially Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and INSYS Therapeutics, Inc., this amending complaint is intended in no way to commence or continue any action or proceeding against these parties, subject to a stay.

| | | Targiniq ER | Oxycodone hydrochloride | Schedule II |
|---|---|---|---|---|
| **Cephalon** | (1)Cephalon, Inc., (2)Teva Pharmaceutical Industries, Ltd., (3)Teva Pharmaceuticals USA, Inc. | Actiq | Fentanyl citrate | Schedule II |
| | | Fentora | Fentanyl citrate | Schedule II |
| | | Generic oxycodone | Oxycodone hydrochloride | Schedule II |
| **Endo** | (1)Endo Health Solutions, Inc., (2)Endo Pharmaceuticals Inc., (3)Qualitest Pharmaceuticals, Inc. (*wholly-owned subsidiary of Endo*) | Opana ER | Oxymorphone hydrochloride extended release | Schedule II |
| | | Opana | Oxymorphone hydrochloride | Schedule II |
| | | Percodan | Oxymorphone hydrochloride and aspirin | Schedule II |
| | | Percocet | Oxymorphone hydrochloride and acetaminophen | Schedule II |
| | | Generic oxycodone | | Schedule II |
| | | Generic oxymorphone | | Schedule II |
| | | Generic hydromorphone | | Schedule II |
| | | Generic hydrocodone | | Schedule II |

| **Defendant Group Name** | **Company Names** | **Drugs** | | |
|---|---|---|---|---|
| | | **Drug Name** | **Chemical Name** | **CSA Schedule** |
| **Mallinckrodt** | (1)Mallinckrodt plc, (2)Mallinckrodt LLC (*wholly-owned subsidiary of Mallinckrodt plc*) | Exalgo | Hydromorphone hydrochloride | Schedule II |
| | | Roxicodone | Oxycodone hydrochloride | Schedule II |
| **Allergan** | (1)Allergan Plc, (2)Actavis LLC, (3)Actavis Pharma, Inc., (4)Actavis Plc, (5)Actavis, Inc., | Kadian | Morphine Sulfate | Schedule II |
| | | Norco (Generic of Kadian) | Hydrocodone and acetaminophen | Schedule II |
| | | Generic Duragesic | Fentanyl | Schedule II |

21

| (6)Watson Pharmaceuticals, Inc., (7)Watson Pharma. Inc. | Generic Opana | Oxymorphone hydrochloride | Schedule II |
|---|---|---|---|

52.      Each of the Racketeering Supply Chain Defendants identified manufactured, shipped, paid for and received payment for the drugs identified above, throughout the United States and in Louisiana, including  Ascension Parish.

53.      The Racketeering Supply Chain Defendants used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, the Racketeering Supply Chain Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

54.      At the same time, the Racketeering Supply Chain Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids, and their compliance with all regulations regarding the identification and reporting of suspicious orders of prescription opioids.

55.      The Racketeering Supply Chain Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

56.      The Racketeering Supply Chain Defendants also communicated with each other and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

57.      The transmissions described herein were made in furtherance of the Racketeering Supply Chain Defendants' scheme and common course of conduct to deceive regulators, the public and the Plaintiffs that these Defendants were complying with their obligations to identify and report

suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The Racketeering Supply Chain Defendants' scheme and common course of conduct was to increase or maintain high production quotas for their prescription opioids from which they could profit.

58. Many of the precise dates of the fraudulent acts have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described some instances of the predicate acts. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

59. The Racketeering Supply Chain Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with these Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the Racketeering Supply Chain Defendants.

60. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

61. The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Racketeering Supply Chain Defendants. The predicate acts were

committed or caused to be committed by the Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

62.     As described above, the Racketeering Supply Chain Defendants were repeatedly warned, fined, and found to be in violation of applicable law and regulations, and yet they persisted. The sheer volume of enforcement actions against the Racketeering Supply Chain Defendants supports this conclusion that the Racketeering Supply Chain Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the authorities.

63.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, Plaintiff's community and the Plaintiff. The Racketeering Supply Chain Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or the Plaintiff. The Racketeering Supply Chain Defendants were aware that Plaintiff and the citizens of these jurisdictions rely on these Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

64.     By intentionally refusing to report and halt suspicious orders of their prescription opioids, the Racketeering Supply Chain Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

---

**ADDITIONAL RACKETEERING CLAIMS**

---

**FIRST SUPPLEMENTAL CLAIM FOR RELIEF**
**Violation of Louisiana Racketeering Act, La. Rev. Stat. Ann. § 15:1351, et seq.—**
**Opioid Marketing Enterprise**
**(Against ~~Purdue~~,[9] Cephalon, Janssen, Endo, and Mallinckrodt—**
**the "Racketeering Marketing Defendants"))**

1.      Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in Plaintiff's original Petition for Damages and in Plaintiff's Short Form Complaint as if fully set forth herein.

2.      The Racketeering Marketing Defendants—through the use of "Front Groups" that appeared to be independent of the Racketeering Marketing Defendants; through the dissemination of publications that supported the Racketeering Marketing Defendants' scheme; through continuing medical education ("CME") programs controlled and/or funded by the Racketeering Marketing Defendants; by the hiring and deployment of so-called "key opinion leaders," ("KOLs") who were paid by the Racketeering Marketing Defendants to promote their message; and through the "detailing" activities of the Racketeering Marketing Defendants' sales forces—conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities to carry-out the common purpose of the Opioid Marketing Enterprise, *i.e.*, to unlawfully increase profits and revenues from the continued prescription and use of opioids for

---

[9] Acknowledging that Bankruptcy Proceedings have been commenced regarding certain Defendants originally named in the original petition for damages, especially Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and INSYS Therapeutics, Inc., this amending complaint is intended in no way to commence or continue any action or proceeding against those parties, subject to a stay.

long-term chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use by convincing them that each of the nine false propositions alleged earlier were true. In so doing, each of the Racketeering Marketing Defendants knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in fraud and activities in violation of law. The Opioid Marketing Enterprise alleged above, is an association-in-fact enterprise that consists of the Racketeering Marketing Defendants (Purdue, Cephalon, Janssen, Endo, and Mallinckrodt); the Front Groups (APF, AAPM, APS, FSMB, USPF, and AGS); and the KOLs (Dr. Portenoy, Dr. Webster, Dr. Fine, and Dr. Fishman).

4.      Each of the Racketeering Marketing Defendants and the other members of the Opioid Marketing Enterprise conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order increase the market for prescription opioids by changing prescriber habits and public perceptions and increase the market for opioids.

5.      Specifically, the Racketeering Marketing Defendants each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; (iii) funding, editing and distributing CME programs to advance their false messages; and (iv) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians and,

in particular, at physicians lacking the expertise of pain care specialists (a practice known as sales detailing).

6.     Each of the Front Groups helped disguise the role of Racketeering Marketing Defendants by purporting to be unbiased, independent patient-advocacy and professional organizations in order to disseminate patient education materials, a body of biased and unsupported scientific "literature," and "treatment guidelines" that promoted the Racketeering Marketing Defendants false messages.

7.     Each of the KOLs were physicians chosen and paid by each of the Racketeering Marketing Defendants to influence their peers' medical practice by promoting the Marketing Defendant's false message through, among other things, writing favorable journal articles and delivering supportive CMEs as if they were independent medical professionals, thereby further obscuring the Racketeering Marketing Defendants' role in the enterprise and the enterprise's existence.

8.     Further, each of the Racketeering Marketing Defendants, KOLs and Front Groups that made-up the Opioid Marketing Enterprise had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Racketeering Marketing Defendants coordinated their efforts through the same KOLs and Front Groups, based on their agreement and understanding that the Front Groups and KOLs were industry friendly and would work together with the Racketeering Marketing Defendants to advance the common purpose of

27

the Opioid Marketing Enterprise; each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

9.      At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Racketeering Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the Racketeering Marketing Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Racketeering Marketing Defendants; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise, including between the Racketeering Marketing Defendants and each of the Front Groups and KOLs; (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

10.      The persons and entities engaged in the Opioid Marketing Enterprise are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities, as spearheaded by the Racketeering Marketing Defendants.

11.      The Racketeering Marketing Defendants conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

12.      The Racketeering Marketing Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years. The multiple acts of racketeering activity that the Racketeering Marketing Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering

activity." The racketeering activity was made possible by the Racketeering Marketing Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise.

13.     Indeed, as summarized herein, the Racketeering Marketing Defendants used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry-out the Opioid Marketing Enterprise's fraudulent scheme.

14.     Because the Racketeering Marketing Defendants disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's acts have been hidden and cannot be alleged without access to the books and records maintained by the Racketeering Marketing Defendants, Front Groups, and KOLs. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However, Plaintiffs have described the occasions on which the Racketeering Marketing Defendants, Front Groups, and KOLs disseminated misrepresentations and false statements to Louisiana consumers (including in Ascension Parish), prescribers, regulators and Plaintiffs, and how those acts were in furtherance of the scheme.

15.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Louisiana consumers (including in  Ascension Parish), prescribers, regulators and Plaintiffs. The Racketeering Marketing Defendants, Front Groups and KOLs calculated and intentionally crafted the scheme and common purpose of the Opioid

Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Racketeering Marketing Defendants understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Racketeering Marketing Defendants' products.

16.     The Racketeering Marketing Defendants' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Racketeering Marketing Defendants are distinct from the Opioid Marketing Enterprise.

17.     The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

18.     The racketeering activities conducted by the Racketeering Marketing Defendants, Front Groups and KOLs amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Louisiana and  Ascension Parish consumers, prescribers, regulators and the Plaintiffs. Each separate act employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Louisiana consumers (including in  Ascension Parish), prescribers, regulators and the Plaintiffs. The Racketeering Marketing Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

19.     Each of the Racketeering Marketing Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the offenses.

20.     As described herein, the Racketeering Marketing Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

21.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

22.     The Racketeering Marketing Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The Racketeering Marketing Defendants' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. Plaintiffs' injuries, as described below, were not unexpected, unforeseen or independent.[10] Rather, as Plaintiffs allege, the Racketeering Marketing Defendants knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA and knew that opioids were highly addictive and subject to abuse.[11] Nevertheless, the Racketeering Marketing Defendants engaged in a scheme of deception in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

23.     It was foreseeable and expected that the Racketeering Marketing Defendants creating and then participating in the Opioid Marketing Enterprise through a pattern of

---

[10] *Travelers Prop. Cas. Co. of Am.* v. *Actavis, Inc.*, 16 Cal. App. 5th 1026, 1030 (2017).
[11] *Id. at* 1041.

racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.[217]

24.    Specifically, the Racketeering Marketing Defendants' creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic. Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

a.  Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

b.  Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c.  Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

d.  Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e.  Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;[12]

f.  Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g.  Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

h.  Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

---

[12] *Id.*

32

    i.   Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

    j.   Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

    k.   Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

    l.   Costs associated with extensive clean up of public parks, spaces, and facilities of needles and other debris and detritus of opioid addiction;

    m.   Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

    n.   Losses caused by diminished property values in the form of decreased business investment and tax revenue.

25.    Plaintiffs' injuries were directly and thus proximately caused by these Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the opioid-addiction epidemic the Racketeering Marketing Defendants created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property.

26.    Plaintiffs are the most directly harmed entity and there is no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

27.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest.

**SECOND SUPPLEMENTAL CLAIM FOR RELIEF**
**Violation of Louisiana Racketeering Act, La. Rev. Stat. Ann. § 15:1351, et seq.—**

**Opioid Supply Chain Enterprise**
**(Against ~~Purdue,~~ [13]Cephalon, Endo, Mallinckrodt, Actavis,**
**McKesson, Cardinal, and AmerisourceBergen—**
**"Racketeering Supply Chain Defendants")**

28.     Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above and in Plaintiff's original Petition for Damages as if fully set forth herein.

29.     The Racketeering Supply Chain Defendants together formed an enterprise, the Opioid Supply Chain Enterprise, for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States, including Ascension Parish, Louisiana. The Opioid Supply Chain Enterprise is an enterprise within the meaning of §La. Rev. Stat. §1352.B . The Opioid Supply Chain Enterprise consists of the Racketeering Supply Chain Defendants.

30.     The Racketeering Supply Chain Defendants were members of the Healthcare Distribution Alliance (the "HDA").[14] Each of the Racketeering Supply Chain Defendants is a member, participant, and/or sponsor of the HDA, and has been since at least 2006, and utilized the HDA to form the interpersonal relationships of the Opioid Supply Chain Enterprise and to assist them in engaging in the pattern of racketeering activity that gives rise to the Count.

31.     At all relevant times, the Opioid Supply Chain Enterprise: (a) had an existence separate and distinct from each of the Racketeering Supply Chain Defendants; (b) was separate and distinct from the pattern of racketeering activity in which the Racketeering Supply Chain Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Racketeering Supply Chain Defendants; (d) was characterized by

---

[13] Acknowledging that Bankruptcy Proceedings have been commenced regarding certain Defendants originally named in the original petition for damages, especially Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and INSYS Therapeutics, Inc., this amending complaint is intended in no way to commence or continue any action or proceeding against those parties, subject to a stay.

[14] *History*, Health Distribution Alliance, https://www.healthcaredistribution.org/about/hda-history (last accessed Sept. 15, 2017).

interpersonal relationships among the Racketeering Supply Chain Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit.. Each member of the Opioid Supply Chain Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid quotas and resulting sales.

32.     The Racketeering Supply Chain Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the Opioid Supply Chain Enterprise through a pattern of racketeering activity within the meaning of La. Rev. Stat. §1352.C..

33.     The Racketeering Supply Chain Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years. The multiple acts of racketeering activity that the Racketeering Supply Chain Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Racketeering Supply Chain Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Supply Chain Enterprise. The Racketeering Supply Chain Defendants participated in the scheme to defraud.

34.     The Racketeering Supply Chain Defendants also conducted and participated in the conduct of the affairs of the Opioid Supply Chain Enterprise through a pattern of racketeering activity by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, punishable under by law.

35.     The Racketeering Supply Chain Defendants committed crimes that are punishable as felonies under by laws. Specifically, it is unlawful for any person to knowingly or intentionally furnish

35

false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed.

36.     Each of the Racketeering Supply Chain Defendants is a registrant.   Their status as registrants requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances and inform the authorities of suspicious orders when discovered by the registrant.

37.     Controlled Substance Violations: The Racketeering Supply Chain Defendants who are Distributor Defendants violated the law by knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, documents filed with the authorities.

38.     The Racketeering Supply Chain Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States, including  Ascension Parish, Louisiana, through this enterprise.

39.     The Racketeering Supply Chain Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the offenses.

40.     The Racketeering Supply Chain Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities about the reality of the suspicious orders that the Racketeering Supply Chain Defendants were filling on a daily basis – leading to the diversion of hundreds of millions of doses of prescriptions opioids into the illicit market.

41.     The Racketeering Supply Chain Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

42.     Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding manufacturing prescription opioids and refusing to report suspicious orders.

43.     As described herein, the Racketeering Supply Chain Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

44.     The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Racketeering Supply Chain Defendants. The predicate acts were committed or caused to be committed by the Racketeering Supply Chain Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

45.     The pattern of racketeering activity alleged herein and the Opioid Supply Chain Enterprise are separate and distinct from each other. Likewise, the Racketeering Supply Chain Defendants are distinct from the enterprise.

46.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

47.     Many of the precise dates of the Racketeering Supply Chain Defendants' criminal actions at issue here have been hidden by Defendants and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Supply Chain Enterprise alleged herein depended upon secrecy.

48.     By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

49.     It was foreseeable to the Racketeering Supply Chain Defendants that Plaintiffs would be harmed when they refused to report and halt suspicious orders, because their violation of the duties imposed by law allowed the widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market—causing the opioid epidemic that the CSA intended to prevent.

50.     The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

51.     The Racketeering Supply Chain Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The Racketeering Supply Chain Defendants' pattern of racketeering activity, including their refusal to identify, report and halt suspicious orders of controlled substances, logically, substantially and foreseeably cause an opioid epidemic. Plaintiffs were injured by the Racketeering Supply Chain Defendants' pattern of racketeering activity and the opioid epidemic that they created.

52.     The Racketeering Supply Chain Defendants knew that the opioids they manufactured and supplied were unsuited to treatment of long-term, chronic, non-acute, and non-

cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.[15] Nevertheless, the Racketeering Supply Chain Defendants engaged in a scheme of deception, that utilized the mail and wires as part of their fraud, in order to increase sales of their opioid products by refusing to identify, report suspicious orders of prescription opioids that they knew were highly addictive, subject to abuse, and were actually being diverted into the illegal market.[16]

53.     The Racketeering Supply Chain Defendants' predicate acts and pattern of racketeering activity were a cause of the opioid epidemic which has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic.

54.     Specifically, Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

a. Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

d. Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e. Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

---

[15] *Travelers Prop. Cas. Co. of Am.* v. *Actavis, Inc.*, 16 Cal. App. 5th 1026, 1030 (2017).
[16] *City of Everett v. Purdue Pharma L.P.*, Case No. 17-cv-00209, 2017 WL 4236062, *2 (W.D. Wash. Sept. 25, 2017).

f.   Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g.   Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.   Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

h.   Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

i.   Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

j.   Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

k.   Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

l.   Losses caused by diminished property values in the form of decreased business investment and tax revenue.

55.   Plaintiffs' injuries were proximately caused by Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the opioid-addiction epidemic created by Defendants' conduct, Plaintiffs would not have lost money or property.

56.   Plaintiffs' injuries were directly caused by the Racketeering Supply Chain Defendants' pattern of racketeering activities.

57.   Plaintiffs are most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

58.   Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia,* actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised

corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*:

a.  Actual damages and treble damages, including pre-suit and post-judgment interest;

b.  An order enjoining any further violations of the Louisiana Racketeering Act;

c.  An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d.  An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e.  An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

f.  An order enjoining any future marketing of opioids through non-branded marketing including through the Front Groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

g.  An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

h.  An order compelling the Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court, but not less than print advertisements in national and regional newspapers and medical journals, televised broadcast on major television networks, and displayed on their websites, concerning: (1) the risk of addiction among patients taking opioids for pain; (2) the ability to manage the risk of addiction; (3) pseudoaddiction is really addiction, not a sign of undertreated addiction; (4) withdrawal from opioids is not easily managed; (5) increasing opioid dosing presents significant risks, including addiction and overdose; (6) long term use of opioids has no demonstrated improvement of function; (8) use of time-released opioids does not prevent addiction; (9) abuse-deterrent formulations do not prevent opioid abuse; and (10) that manufacturers and distributors have duties under the CSA to monitor, identify, investigate, report and halt suspicious orders and diversion but failed to do so;

i.  An order enjoining any future lobbying or legislative efforts regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

j.  An order requiring all Defendants to publicly disclose all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

41

k. An order prohibiting all Defendants from entering into any new payment or sponsorship agreement with, or related to, any: Front Group, trade association, doctor, speaker, CME, or any other person, entity, or association, regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

l. An order establishing a National Foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the Defendants in an amount to be determined by the Court;

m. An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious orders or diversion of opioids;

n. An order requiring all Defendants to publicly disclose all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding suspicious orders for or the diversion of opioids;

o. An order divesting each Defendant of any interest in, and the proceeds of any interest in, the Marketing and Supply Chain Enterprises, including any interest in property associated with the Marketing and Supply Chain Enterprises;

p. Dissolution and/or reorganization of any trade industry organization, Front Group, or any other entity or association associated with the Marketing and Supply Chain Enterprises identified in this Complaint, as the Court sees fit;

q. Dissolution and/or reorganization of any Defendant named in this Complaint as the Court sees fit;

r. Suspension and/or revocation of the license, registration, permit, or prior approval granted to any Defendant, entity, association or enterprise named in the Complaint regarding the manufacture or distribution of opioids;

s. Forfeiture as deemed appropriate by the Court; and

t. Attorney's fees and all costs and expenses of suit.